UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VINCENT BETANCES,                    :
                                     :
        Petitioner,                  :
                                     :      PRISONER
V.                                   :      Case No. 3:04-CV-1097(RNC)
                                     :
WARDEN HINKLE,                       :
                                     :
        Respondent.                  :

RULING AND ORDER

        Petitioner, a Connecticut inmate proceeding pro se, brings

this action for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 challenging his conviction on charges of possession of

narcotics with intent to sell and possession of narcotics within

1500 feet of a school.  For the reasons that follow, the petition

is denied.

I.   Standard of Review

        Under § 2254, as amended by the Antiterrorism and Effective

Death Penalty Act of 1996, a federal court can grant habeas

corpus relief to a state prisoner on a claim adjudicated on the

merits in state court only when "adjudication of the claim . . .

resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States."  28 U.S.C.

§ 2254(d)(1).  For purposes of this statute, federal law is

"clearly established" if it is found in holdings of the Supreme

Court as of the date of the state court decision.  Williams v.

<u>Taylor</u>, 529 U.S. 362, 412 (2000).  The federal law "may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context."  <u>Kennaugh v. Miller</u>, 289 F.3d 36, 42 (2d Cir. 2002).

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that precedent]."  <u>Williams</u>, 529 U.S. at 405.  "In either event, a state court ruling is 'contrary to' Supreme Court precedent only if it is 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed' to the precedential holding."  <u>Lurie v. Wittner</u>, 228 F.3d 113, 127 (2d Cir. 2000) (quoting <u>Williams</u>, 529 U.S. at 405).  The state court need not identify or be aware of the governing precedent so long as the court's reasoning and result do not contradict it.  <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

When a state court applies Supreme Court precedent without directly contradicting it, the petitioner's claims should be assessed under the "unreasonable application" prong of § 2254(d)(1).  <u>See</u> <u>Lurie</u>, 228 F.3d at 128.  A state court decision is an unreasonable application of clearly established

federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the particular case."  Bell v. Cone, 535 U.S. 685, 694 (2002).  This inquiry focuses "on whether the state court's application of clearly established federal law [was] objectively unreasonable." Id.

II.  Facts

Under § 2254(e)(1), the state court's findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. Petitioner does not contest the Connecticut Supreme Court's summary of the facts:

> On June 20, 2000, Detective Alfonso Vasquez and Officer Quincy Freeman of the New Haven police department were working with the New Haven gang task force.  At about 7:19 a.m., the officers, dressed in plain clothes, drove an unmarked vehicle to the intersection of James Street and Woolsey Street in the Fair Haven section of New Haven after the officers learned from a confidential informant that a man was dealing heroin in that area.  The informant described the individual as a Hispanic male who was wearing a white T-shirt, blue sweatpants and blue slippers and was walking a small dog with a leash having a red handle.  The officers arrived at the scene and Vasquez parked the vehicle.  Several seconds later, the officers saw the defendant, who matched the informant's description, walking on James Street toward Grand Avenue.  Shortly thereafter, an unidentified white male approached the defendant and, after a brief conversation, engaged in a rapid hand-to-hand transaction with the defendant.  On the basis of their training and experience, the officers believed they had witnessed a drug transaction.  The exchange took place

less than 1500 feet from the Christopher Columbus
School, a public school in New Haven.

Vasquez made a U-turn on James Street and began
driving toward the defendant.  Freeman pulled out his
badge, which was on a chain around his neck, opened the
door to the vehicle, identified himself as a police
officer and ordered the defendant to come over to him.
The defendant walked toward Freeman and began pulling
items, including money and papers, out of his pockets
and discarding them on the ground.  Freeman ordered the
defendant to remove his hands from his pockets, but the
defendant failed to comply.  When Freeman came within
two feet of the defendant, the defendant backed up,
reached into his pocket, put something into his mouth,
and then turned and attempted to run away.  Fearing
that the defendant was destroying evidence, Freeman
grabbed the defendant around the waist from behind and
attempted to restrain him.  Vasquez then exited the
vehicle and attempted to subdue the defendant by
grabbing his shoulder.  Because the defendant
continually reached toward his waistband with his left
hand, Vasquez feared that he had a weapon there and
attempted to keep the defendant's hand away from that
area.  The defendant continued to struggle with the
officers and attempted to run away, but the officers
ultimately subdued and handcuffed him and placed him
under arrest for interfering with a police officer.

At that point, Vasquez conducted a patdown search
of the defendant and detected a hard, square object in
the waist area of his pants.  Vasquez opened the
defendant's waistband and removed thirty glassine bags
labeled, "The Cure," which, after a field test, he
confirmed to be heroin.  In addition, the officers
seized $113 that the defendant had thrown onto the
ground.

After other police units arrived, the defendant
was placed in the backseat of a police cruiser.  While
in the back of the cruiser, the defendant began showing
signs of medical distress, including paleness, profuse
sweating, difficulty breathing and a lack of response
to verbal commands.  In addition, his eyes rolled
toward the top of his head.  Vasquez asked the
defendant if he had swallowed any drugs, and the
defendant replied that he had swallowed four bags of
heroin.  Fearing for the defendant's safety, the police

called for an ambulance.  After the defendant was
initially treated at the scene, an ambulance
transported him to Yale-New Haven Hospital for further
treatment.  Freeman accompanied the defendant in the
back of the ambulance.  The emergency medical
technician placed a mask over the defendant's nose and
mouth to help him breathe.  He also administered
Narcan, a medication that prevents cells from absorbing
narcotics.  Soon thereafter, the defendant asked the
emergency medical technician to remove the mask and
vomited eight heroin packets labeled "The Cure."  Upon
arrival at the hospital, Freeman seized the eight
packets of heroin.

    Prior to trial, the defendant filed a motion to
suppress: (1) incriminating statements regarding the
alleged ingestion of narcotic substances made to
Vasquez and any and all police officers and medical
personnel; (2) any and all evidence obtained as a
result of any incriminating statement made; and (3) the
thirty bags of heroin that were seized from his person.
The court granted the motion with respect to the
defendant's statement regarding the ingestion of four
bags of heroin, concluding that it was the product of
an unlawful custodial interrogation.  The trial court
denied the motion, however, with respect to the second
and third issues.  The court concluded that Vasquez had
seized the thirty bags of heroin from the defendant's
person during a lawful search incident to a lawful
arrest and that the eight bags of heroin that Freeman
had seized after the defendant vomited them were not
the fruit of an illegal search.

    Also prior to trial, the defendant subpoenaed the
office of the corporation counsel of the city of New
Haven and the keeper of records of the New Haven police
department for, inter alia, Freeman's personnel
records.  The defendant claimed that those files were
necessary because Freeman's testimony on the witness
stand during the suppression hearing was inconsistent
with his police report.  The office of the corporation
counsel and the department of police services moved to
quash the defendant's subpoena of police personnel
records.  In addition, the state moved for a protective
order for those records.  The court granted both
motions.

State v. Betances, 265 Conn. 493, 496-99 (2003) (footnotes

omitted).

On June 13, 2001, after a jury trial in the state superior court, petitioner was convicted of possession of narcotics with intent to sell, see Conn. Gen. Stat. § 21a-277(a), and possession of narcotics within 1500 feet of a school, see Conn. Gen. Stat. § 21a-279(d).  He was sentenced to seventeen years' imprisonment.

Petitioner appealed his conviction on three grounds: (1) the trial court denied his motion to suppress the vomited heroin in violation of his Fifth Amendment right against self-incrimination, (2) the trial court denied his request for in camera review of the arresting officer's personnel file, and (3) the trial court improperly instructed the jury on reasonable doubt.  See Betances, 265 Conn. at 494.  The Connecticut Supreme Court affirmed petitioner's conviction in August 2003.

III. Discussion

The petition raises the same three claims rejected by the Connecticut Supreme Court.  Each claim is discussed below.

A.   Suppression of the Heroin

Petitioner first challenges the trial court's denial of his motion to suppress the heroin he vomited in the ambulance.  He argues that, because he was not advised of his Fifth Amendment rights before being asked whether he had ingested drugs, the heroin was the product of a statement obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  The Superior Court held

6

that Miranda required suppression of the statement but not the
heroin.  The Connecticut Supreme Court found it unnecessary to
decide whether the heroin was a product of the statement because
it concluded that the statement itself was admissible under the
public safety exception to Miranda.[1]

In New York v. Quarles, 467 U.S. 649, 654 (1984), the Court
recognized a public safety exception to the Fifth Amendment
privilege against self-incrimination.  See id. at 655-59.[2]  The
exception permits the admission of statements obtained without
first providing Miranda warnings when immediate questioning is

_____

[1] In a case decided after the Connecticut Supreme Court's
decision, the Supreme Court held that the Fifth Amendment does
not require the exclusion of physical evidence obtained as a
result of a defendant's voluntary statements made without notice
of his Miranda rights.  See United States v. Patane, 542 U.S.
630, 643, 645 (2004) (plurality and concurring opinions).  I need
not decide whether Patane applies in this case because I find
that the Connecticut Supreme Court reasonably concluded that the
underlying statement did not violate Miranda.  See New York v.
Quarles, 467 U.S. 649, 660 n.9 (1984) ("Because we hold that
there is no violation of Miranda in this case, we have no
occasion to reach arguments . . . that the gun is admissible . .
. because it is nontestimonial . . . .").

[2] In Quarles, a woman informed police officers that she had
just been raped.  She described the attacker and told the
officers that he had a gun and had run into a nearby supermarket.
An officer entered the supermarket and identified a man fitting
the description.  The suspect ran toward the back of the store,
but the officer successfully apprehended him.  While frisking the
suspect, the officer noticed an empty shoulder holster.  After
handcuffing the suspect but before advising him of his Miranda
rights, the officer asked him where the gun was located and the
suspect told the officer where to find the gun.  The officer
found the gun, arrested the suspect, and then gave him the
warnings required by Miranda.  See 467 U.S. at 651-52.

7

"necessary to secure [the officer's] safety or the safety of the public."  Id. at 659.  The Court emphasized that the provision of Miranda warnings in such circumstances might deter criminal suspects from disclosing information necessary to protect the public.  The Court stated:

> We decline to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

Id. at 657-58.

The Connecticut Supreme Court interpreted the Quarles public safety exception to include the safety of the criminal suspect. Because the Supreme Court has had no occasion to consider this question, the Connecticut Supreme Court's opinion is not "contrary" to federal law for purposes of § 2254.

The more appropriate inquiry in this case is whether the Connecticut Supreme Court's decision to extend the Quarles exception to encompass situations presenting a risk to the suspect's safety is reasonable.  I believe it is.  The Quarles exception was recognized by the Court in order to allow police officers "to follow their legitimate instincts when confronting situations presenting a danger to the public safety."  467 U.S. at 659.  The Court thought that "police officers can and will

distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." Id. at 658-59.[3]  When facing an "immediate danger" to the life of a criminal suspect, Betances, 265 Conn. at 505, officers should not be placed in the "untenable position" of having to decide whether to safeguard the suspect's safety and "render whatever probative evidence they uncover inadmissible" or provide Miranda warnings and divert the suspect from disclosing information necessary for his protection.  See Quarles, 467 U.S. at 657-58.

The Connecticut Supreme Court's conclusion that the facts of this case bring it within the scope of the Quarles exception is also reasonable.  Petitioner was not immediately asked whether he

_____

[3]  Other courts have inferred from Quarles that the public safety exception encompasses the safety of the suspect.  See, e.g., United States v. Webb, 755 F.2d 382, 392 n.14 (5th Cir. 1985) (assuming hypothetically that a psychiatrist's questions to a suspect constituted custodial interrogation, the psychiatrist's efforts to prevent the suspect's suicide were analogous to the public safety exception in Quarles); United States v. Lutz, 207 F. Supp. 2d 1247, 1258 (D. Kan. 2002) (suggesting that Quarles may apply when a suspect's health and safety are involved, but rejecting the exception on the facts of the case); Benson v. State, 698 So.2d 333, 337 (Fla. Dist. Ct. App. 1997) (applying the public safety exception when police asked the suspect how much crack cocaine he had swallowed); People v. Stevenson, 51 Cal. App. 4th 1234, 1239-40 (1996) ("The doctrinal underpinnings of Miranda do not require us to exclude appellant's statement, thus penalizing the deputy for asking the very questions which were the most crucial to the effort to provide appellant with medical treatment.").  But see State v. Montoya, 937 P.2d 145, 151 (Utah Ct. App. 1997) (Quarles exception does not protect a suspect's safety).

9

had ingested drugs, even though the arresting officer had seen him put his hand to his mouth.  This question was put to him only after he exhibited signs of acute and worsening medical distress.  In the circumstances, a reasonable officer could think that petitioner was likely to lose consciousness before medical help arrived.  The officer's question was thus "reasonably prompted by a concern" for petitioner's safety.  Id. at 656.

    B.   Request for In Camera Review

    Petitioner next argues that the Superior Court improperly denied his request for in camera review of the personnel records of the arresting officer.  The Connecticut Supreme Court affirmed the Superior Court's decision, concluding that petitioner had failed to make a showing of relevancy to justify his request for in camera review.  See Betances, 265 Conn. at 506-08.

     The defendant's claim that he was denied access to favorable evidence in violation of his federal constitutional rights is appropriately analyzed under the Due Process Clause of the Fourteenth Amendment.  See Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987) (plurality opinion).  Under Supreme Court precedent, the government is obliged to disclose "evidence in its possession that is both favorable to the accused and material to guilt or punishment."  Id. at 57.  When a defendant requests disclosure of confidential information, he is entitled to in camera review of the evidence by the court, which must release to

the defense "information material to the fairness of the trial."
Id. at 60.  To obtain in camera review of confidential
information, a criminal defendant must "first establish[] a basis
for his claim that it contains material evidence."  Id. at 58
n.15 (citing United States v. Valenzuela-Bernal, 458 U.S. 858,
867 (1982)).  The specificity of a defendant's request may
influence the court's assessment of whether the requested
information contains relevant material.  See id.

The Connecticut Supreme Court, though not citing Supreme
Court precedent, properly applied the general standard laid out
in Ritchie.  The Court determined that petitioner was not
entitled to in camera review of the officer's confidential
personnel file because he offered no facts suggesting that the
file contained material information.  The Court explained:

> [T]he defendant's request for information from
> Freeman's personnel file was not specific and did not
> sufficiently set forth the issue in the case to which
> the information sought would relate.  The defendant
> stated at the hearing on the motion to quash that he
> had subpoenaed Freeman's personnel files to see "if he
> has a problem effectuating legal arrests . . . ."  He
> argued further that he would "like to see if there is a
> question as to him harassing potential arrestees" by
> "requiring that [they] either . . . snitch or face
> arrest."   The defendant also stated that he considered
> his arrest to be retaliatory and that he was concerned
> about the number of alleged inconsistencies in
> Freeman's testimony at the suppression hearing.  The
> defendant did not contend, however, that the officers
> had planted the heroin on him and adduced no evidence
> suggesting that Freeman had done so to other persons in
> the past.

Betances, 265 Conn. at 507-08 (omissions and alteration in

original).  Based on these facts, the Court concluded that the
personnel records were not material to any issue in the case and
that petitioner "merely was seeking to conduct a 'fishing
expedition' through Freeman's personnel records." Id. at 508.
Given that defendant's arguments for disclosure of the
confidential information were speculative, the Court's decision
affirming the quashing of the subpoena is a reasonable
application of the requirement that a defendant "establish[] a
basis for his claim that [the confidential information] contains
material evidence." Ritchie, 480 U.S. at 58 n.15.[4]

    C.   Jury Instruction on Reasonable Doubt

Finally, petitioner challenges the trial court's instruction
that reasonable doubt is "not a doubt suggested by counsel which
is not warranted by the evidence" on the ground that the
Connecticut Supreme Court had previously directed trial courts to
refrain from using somewhat similar language.  On appeal, the

---

[4] The Connecticut Supreme Court observed that a request for
confidential information "should be specific and should set forth
the issue in the case to which the personnel information sought
will relate." Betances, 265 Conn. at 507 (quoting State v.
Januszewski, 182 Conn. 142, 173 (1980)).  In Ritchie, the Supreme
Court noted that the prosecutor's obligation to disclose
exculpatory information does not depend on the presence of a
specific request, although the specificity of a request "may have
a bearing on the trial court's assessment . . . of the
materiality of the nondisclosure."  480 U.S. at 58 n.15.  I do
not read the Connecticut Supreme Court's discussion of "specific"
requests to contradict the general principle that a prosecutor
must disclose exculpatory evidence even in the absence of a
specific request from the defendant.

Court rejected petitioner's argument on the ground that the jury instructions, viewed as a whole, were not misleading.  Betances, 265 Conn. at 508-11.

The United States Supreme Court has never held that this particular instruction violates due process.  Accordingly, the Connecticut Supreme Court's decision is not contrary to clearly established federal law.  However, the Supreme Court has forged general standards governing challenges to reasonable doubt instructions.  The Due Process Clause mandates that the state prove guilt beyond a reasonable doubt.  Cupp v. Naughten, 414 U.S. 141, 147 (1973) (citing In re Winship, 397 U.S. 358 (1970)).  Challenging a reasonable doubt instruction requires showing "a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet [this standard]."  Victor v. Nebraska, 511 U.S. 1, 6 (1994).  A court need not use any particular language when describing the prosecution's burden of proof, id. at 5, and the reviewing court should examine the entire charge rather than a single instruction "in artificial isolation," Cupp, 414 U.S. at 146-47.

The Connecticut Supreme Court reasonably applied this precedent.  Viewing the charge as a whole, the Court concluded that the qualification "not warranted by the evidence" dispelled any confusion created by the phrase "not a doubt suggested by counsel."  Betances, 265 Conn. at 511.  Moreover, as in Cupp,

13

"the State's burden was emphasized and re-emphasized in the course of the complete jury instructions," 414 U.S. 148, and the disputed phrase was but one phrase in a page-long explanation of the meaning of "reasonable doubt."

IV.  <u>Conclusion</u>

For the foregoing reasons, the petition for writ of habeas corpus [Doc. #1] is hereby denied.  The Clerk is directed to enter judgment in favor of respondent and close the case.

So ordered.

Dated at Hartford, Connecticut this 25th day of August 2006.


_____/s/_____
     Robert N. Chatigny
United States District Judge

14